**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

STEVEN SHADLE,

          Plaintiff,

    v.

PENNSYLVANIA STATE SYSTEM
OF HIGHER EDUCATION, *et al.*,

          Defendants.

No. 4:25-CV-00476

(Chief Judge Brann)

**MEMORANDUM OPINION**

**NOVEMBER 26, 2025**

## I.    BACKGROUND

On March 14, 2025, Plaintiff, Steven Shadle, filed a seven-count complaint against Defendants, Pennsylvania State System of Higher Education ("PASSHE"), Commonwealth University of Pennsylvania ("Commonwealth") (together "University Defendants"), Tena Maurer, and Belinda Sauers (together "Individual Defendants").[1] On May 13, 2025, Defendants filed a motion to dismiss.[2] In response, Shadle filed an amended complaint on July 2, 2025, in which he added factual allegations and removed two counts, for a revised total of five.[3]

---

[1]   Doc. 1 (Compl.).
[2]   Doc. 6 (First Mot. to Dismiss).
[3]   Doc. 12 (Am. Compl.)

On July 15, 2025, Defendants moved to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[4] The motion is now ripe for disposition; for the reasons that follow, it is granted in part and denied in part.

## II.    DISCUSSION

### A.    Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[5] and *Ashcroft v. Iqbal*,[6] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[7] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of

---

4    Doc. 14 (Second Mot. to Dismiss).
5    550 U.S. 544 (2007).
6    556 U.S. 662 (2009).
7    *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[8]

A plaintiff in an employment discrimination case does not need to establish a prima facie case in his or her complaint.[9] "A prima facie case is 'an evidentiary standard, not a pleading requirement.'"[10] At the motion to dismiss stage, then, the plaintiff must simply allege "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements" of a prima facie case.[11]

When deciding a motion to dismiss, a court generally considers only the allegations in the complaint, exhibits attached thereto, and facts of public record.[12] Normally, to consider anything beyond those sources, a motion to dismiss must be converted to a motion for summary judgment.[13] But consideration of materials outside the complaint is not completely barred on a 12(b)(6) motion. Courts may consider any documents that are integral or explicitly relied upon in the complaint.[14] "However, before materials outside the record may become the basis for a dismissal, several conditions must be met."[15] "For example, even if a document is 'integral' to

---

[8]  *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

[9]  *Id.* at 788.

[10]  *Id.* at 789 (quoting *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002)

[11]  *Id.* (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (internal quotations and alterations omitted)).

[12]  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

[13]  *See* Fed. R. Civ. P. 12(d).

[14]  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).

[15]  *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."[16] It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document.[17] In this matter, the Court finds that these conditions have been met, and will consequently consider Defendant's attachments, although they do not impact the outcome of this decision.

### B.    Facts Alleged in the Amended Complaint

The facts alleged in the amended complaint, which this Court must accept as true for the purposes of this motion, are as follows.

Steven Shadle works as a Maintenance Repairman II at the Lock Haven Campus of Commonwealth University of Pennsylvania, where he has been employed since 1998.[18] Before starting at Lock Haven, Shadle served in the United States Air Force and was honorably discharged in March 1996.[19]

---

[16]  *Id.*; *see also Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).

[17]  *Faulkner*, 463 F.3d at 134.

[18]  Doc. 12 ¶ 21. Although not directly relevant to the instant case, the Court notes that Lock Haven University of Pennsylvania was a standalone public university until the PASSHE began to consolidate Pennsylvania's public university system in 2022. *See History*, Commonwealth University of Pennsylvania, https://www.commonwealthu.edu/about/history (last visited Nov. 18, 2025); Kevin Hensil, *Board of Governors approve student-centered university integration plans*, Pa. State Sys. of Higher Educ. (July 14, 2021), https://www.passhe.edu/news/releases/2021-07-11-Board-of-Governors-Integrations.html. Lock Haven combined with Bloomsburg and Mansfield Universities to form Commonwealth University. *Id.* In the interest of precision and familiarity, the Court refers to the Lock Haven Campus of Commonwealth University as "Lock Haven."

[19]  Doc. 12 ¶¶ 20, 126.

On January 13, 2023, the University Defendants posted a job opening for a Safety Inspector at Lock Haven.[20] The posting listed several "Minimum Qualifications" for the position, including: "Successful completion of the Safety Inspector Trainee program; or One-year experience with inspecting or maintaining fire suppression systems and equipment for compliance with applicable safety regulations"; "a valid PA Driver License"; and "Knowledge of NFPA 25."[21] Shadle alleges that the Safety Inspector Trainee program requirement could be completed after hiring.[22] The posting did not list any other "requisite, minimum, or preferred qualifications," nor was Shadle made aware of any other qualifications.[23] Belinda Sauers and her successive supervisors, first Deanna Hill and then Tena Maurer, oversaw hiring for the position.[24]

Shadle applied for the position on January 19.[25] He submitted a formal application including his resume and a letter of application, in which he claimed eligibility for "veterans' preference" under the Pennsylvania Veterans' Preference

---

[20] *Id.* ¶ 24.

[21] *Id.* ¶ 30. "NFPA 25" undoubtedly refers to the National Fire Protection Association's "Standard for the Inspection, Testing, and Maintenance of Water-Based Fire Protection Systems." *NFPA 25*, Nat'l Fire Protection Assoc., https://www.nfpa.org/codes-and-standards/nfpa-25-standard-development/25 (last visited Nov. 10, 2025).

[22] *Id.* ¶ 32.

[23] *Id.* ¶¶ 34-36, 58-59.

[24] *Id.* ¶¶ 27-28. When the position was posted, Ms. Hill (who is not a party) was Ms. Sauers's supervisor and had hiring authority. *Id.* ¶ 8. Ms. Hill retired on April 21, 2023, at which point Ms. Maurer took over. *Id.* ¶¶ 8-10.

[25] *Id.* ¶ 37.

Act ("VPA"),[26] explained that he had not yet completed the Safety Inspector Trainee program, and mistakenly indicated that he lacked one-year experience with instructing or maintaining fire suppression system and did not have knowledge of NFPA 25.[27]

On February 17, Shadle apparently spoke with Ms. Hill, who informed him that he met the position's minimum qualifications.[28] Several days later, on February 22, Shadle sent a clarifying email to Ms. Hill addressing his qualifications.[29] He followed up again in more detail on February 28, explaining that he had "24 years of experience visually inspecting" fire suppression systems and equipment (although he not previously held a position "of solely inspecting and maintaining") and that he had general familiarity with NFPA 25 and "would have no issue" getting NFPA 25 certified after being hired (although he was not already certified).[30] Shadle also noted the he had other relevant maintenance experience and possessed "[e]xtensive knowledge of locations and functional maintenance of campus fire suppression and safety systems" given his "24 years" at Lock Haven.[31] According to Shadle, "the combination of [his] application documents and emails . . . evidenced that he met the requisite requirements for the position."[32]

---

[26] *See* 51 Pa. Cons. Stat. §§ 7101-7111.
[27] Doc. 12 ¶¶ 37-41.
[28] *Id.* ¶ 42.
[29] *Id.* ¶¶ 44-45.
[30] *Id.* ¶¶ 46-47.
[31] *Id.* ¶¶ 47-50.
[32] *Id.* ¶ 51.

Also on February 28, Ms. Hill informed Shadle (and presumably the other applicants) that twelve people had applied for the position and four had been selected for first round interviews.[33] Shadle was one of the interviewees.[34] According to Shadle, "[n]one of the other interviewed applicants were veterans."[35] Shadle infers that "he possessed more than the minimum qualifications" for the position from the fact that he was selected for an interview,[36] and alleges that "[t]he official Applicant Log . . . admitted and confirmed that Shadle met the minimum qualifications for the position."[37] Yet although he had never been informed of any "preferred qualifications" for the position, the Applicant Log also allegedly stated that Shadle did not meet "some/all of preferred qualifications."[38]

Shadle was dropped from consideration for the position after his interview on March 8.[39] A note on the Applicant Log stated that he "did not emerge among the most qualified candidates post interview," and an internal email from a member of the search committed noted that Shadle did not meet the "[e]xperience requirement(s)" and "[m]eets minimum quals, but not among the most qualified candidates."[40] Shadle scored a 27 on his interview, which he notes is below the

---

[33] *Id.* ¶ 52.
[34] *Id.* ¶ 53.
[35] *Id.* ¶ 57.
[36] *Id.* ¶ 54.
[37] *Id.* ¶ 55.
[38] *Id.* ¶ 60.
[39] *Id.* ¶ 66.
[40] *Id.* ¶ 61.

scores of the two candidates who received second round interviews, but only by two points.[41] Another applicant, Holly Evans, received similar remarks on the applicant log.[42] She scored lower than Shadle at the pre-interview stage, and was not granted an interview.[43]

Following Shadle's failed application, his union representatives inquired about application of the VPA, and Ms. Hill allegedly "admitted . . . that Defendants had not been operating under the . . . Act as it existed at that time," and confirmed "that Shadle met the minimum requirements for the position."[44] After Ms. Hill retired, Shadle's union representatives asked Ms. Maurer about Shadle's qualifications, and she explained that she did not believe Shadle met the minimum requirements.[45] Shadle alleges that Ms. Maurer's response was knowingly untrue.[46] After it was clear that Shadle would not be hired for the January posting, his union filed a Grievance alleging a violation of the VPA.[47] The University Defendants denied the Grievance, contending that Shadle did not meet the minimum requirements for the position.[48]

---

[41] *Id.* ¶ 65.
[42] *Id.* ¶ 67.
[43] *Id.*
[44] *Id.* ¶¶ 68-70.
[45] *Id.* ¶ 74.
[46] *Id.* ¶ 75.
[47] *Id.* ¶ 79.
[48] *Id.* ¶ 80.

On May 24, the University Defendants sent an email to Shadle stating that "the University has made the decision to move the search in another direction that more closely fits our needs at this time."[49] None of the applicants for the January posting was hired.[50]

On June 12, the University Defendants posted another job opening for a Safety Inspector at Lock Haven.[51] The June posting included the same "Position Description," "Specific Duties," and "Minimum Qualifications" as the January posting.[52] But unlike the January posting, the June posting included new "Preferred Qualifications," such as: "Three years' experience in the fire services"; "Experience with fire extinguishers, sprinkler systems, and other safety equipment"; "Knowledge and demonstrated ability to use Microsoft Word, Excel, and PowerPoint"; and "Completed training relevant to the position," and permitted applicants to submit "Optional Documents" such as "Professional Licenses/Certifications."[53] Shadle contends that "these 'Preferred Qualifications' and Optional Document were added specifically in an attempt to circumvent the VPA and preclude Shadle from being awarded the position."[54] Furthermore, Shadle alleges that "Defendants knew that Ms. Evans possessed some of the newly added 'Preferred Qualifications and

---

[49] *Id.* ¶ 76.
[50] *Id.* ¶ 78.
[51] *Id.* ¶ 83.
[52] *Id.* ¶¶ 85-86.
[53] *Id.* ¶¶ 87-89.
[54] *Id.* ¶ 90.

'Optional Documents'" and "added and tailored [those options] specifically to benefit and enable the hiring of [Ms.] Evans, a female non-veteran."[55]

The same day, in an email exchange involving University Defendants' personnel, Individual Defendants, and Shadle's union representative, the participants debated whether the June posting could be made public without union approval given the changes that had been made.[56] The position was ultimately posted.[57]

On June 27, Shadle applied for the June posting.[58] Ms. Evans also applied.[59] Although their answers to the "Supplemental Questions" on their applications were the same, in "Preferred Qualifications," Ms. Evans listed "Interior firefighting, exterior firefighting, hazardous materials operations level," and she included two "Licenses/Certifications": "Hazmat First Responder" and "Bidic Vehicle Rescue Technician."[60] Shadle listed "Skills and Qualifications" of "Leadership Across Functional Management Communication" and "Project Management Problem Solving," as well as OSHA Licenses/Certifications regarding "Universal Refrigerant, Hazardous Materials, Lockout/Tagout, and Health Hazard Awareness."[61] Shadle concedes that he lacked the Preferred Qualification of "three

---

[55]  *Id.* ¶ 92.
[56]  *Id.* ¶¶ 94-97.
[57]  *Id.* ¶ 97.
[58]  *Id.* ¶ 99.
[59]  *Id.* ¶ 100.
[60]  *Id.* ¶¶ 102-04.
[61]  *Id.* ¶ 107.

years' experience in the fire services," but earlier states that he had the qualification.[62] Shadle was not interviewed for the position; Ms. Evans was hired.[63]

Shadle filed another Grievance through his union, which was again denied.[64] In the denial, Ms. Maurer stated that "Shadle did not meet one of the 'minimum requirements.'"[65]

Shadle's amended complaint sets forth five counts.[66] Count I is brought against all defendants and alleges a violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), which prohibits discrimination against individuals on the basis of their status as veterans.[67] Count II alleges that the Individual Defendants violated Shadle's procedural due process rights under the Fourteenth Amendment to the United States Constitution by depriving him of the veterans' preference benefit he was due under state law.[68] Count IV alleges that the Individual Defendants violated Shadle's equal protection rights under the Fourteenth Amendment when they hired a woman.[69] Count VI is a civil rights conspiracy charge brought against the Individual Defendants pursuant to 42

---

[62] *Compare id.* ¶ 109 *with id.* ¶ 101.

[63] *Id.* ¶¶ 112-13.

[64] *Id.* ¶¶ 114-15.

[65] *Id.* ¶ 115.

[66] *See generally id.* When Shadle amended his complaint, he simply removed several counts without renumbering them. Accordingly, the counts are nonconsecutive and labeled up to seven.

[67] 38 U.S.C. §§ 4301-35.

[68] *See* 42 U.S.C. § 1983 (authorizing suit against states for violations of constitutional rights).

[69] *Id.*

U.S.C. § 1985 based on the alleged constitutional violations in the previous two counts. Finally, Count VII charges the University Defendants with a violation of the VPA for failing to give preference to Shadle's application.[70]

## C.    Analysis

The Court proceeds to analyze the claims in the order Shadle presents them. The upshot is this: (1) his USERRA claim must be dismissed for lack of jurisdiction; (2) the due process claim, though thin, states a claim under existing law; (3) the equal protection claim fails; (4) the conspiracy claim fails; and (5) I decline to dismiss the VPA claim. Accordingly, I grant in part and deny in part the motion to dismiss.

### 1.    USERRA

"Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."[71] When Congress has provided judicial authority to consider and remedy a particular type of dispute, it has granted "subject-matter jurisdiction" over that claim.[72] "[F]ederal courts 'have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.'"[73] "If the court determines at any time that it lacks

---

[70]    *See* 52 Pa. Cons. Stat. §§ 7101-11.

[71]    *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (citing *Marbury v. Madison*, 1 Cranch 137, 173-80 (1803)).

[72]    *See Page v. Schweiker*, 786 F.2d 150, 153 (3d Cir. 1986).

[73]    *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 267 (3d Cir. 2016) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)).

subject-matter jurisdiction, the court must dismiss the action."[74] Accordingly, if Congress has not statutorily conferred jurisdiction on a federal court, it cannot adjudicate the claim.[75]

Shadle brings his USERRA claim on his own behalf against Pennsylvania state instrumentalities and employees.[76] USERRA provides that such claims "may be brought in a State court of competent jurisdiction in accordance with the laws of that State."[77] Although written permissively, every federal Court of Appeals to consider the provision has determined that Congress "inten[ded] to limit USERRA suits against states to state courts."[78] The Supreme Court has also embraced this interpretation in dicta.[79] District Courts in Pennsylvania have adopted this reasoning and concluded that "although USERRA provides a federal cause of action, USERRA also divests federal courts of their jurisdiction in actions brought against states, as employers."[80] And USERRA did not "enact a cause of action against the employee's

---

[74] Fed. R. Civ. P. 12(h)(3).

[75] *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553 (2005).

[76] *See* Doc. 12 ¶¶ 2-5; 24 Pa. Stat. § 20-2002-A(a).

[77] 38 U.S.C. § 4323(b)(2); *see* 38 U.S.C. § 4303(14) (defining "State" to "includ[e] the agencies and political subdivisions thereof").

[78] *Velasquez v. Frapwell*, 165 F.3d 593, 594 (7th Cir. 1999) (per curiam); *McIntosh v. Partridge*, 540 F.3d 315, 321 (5th Cir. 2008); *Townsend v. Univ. of Alaska*, 543 F.3d 478, 482-84 (9th Cir. 2008); *Wood v. Fla. Atl. Univ. Bd. of Trustees*, 432 F. App'x 812, 815 (11th Cir. 2011).

[79] *Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 595 (2022) ("Congress' clarification that suits proceed 'in a State court of competent jurisdiction in accordance with the laws of the State' merely addresses the fact that USERRA suits *must be brought in state (rather than federal) court*." (emphasis added)).

[80] *MacMillan v. Pa. Air Nat'l Guard*, No. 18-CV-0576, 2018 WL 2730883, at *1 & n.1 (W.D. Pa. June 7, 2018) (citing *Wood*, 432 F. App'x at 815 and *McIntosh*, 540 F.3d at 321). Notably, the interpretation is that Congress has *affirmatively stripped* federal courts of jurisdiction over USERRA claims, rendering supplemental jurisdiction inappropriate. *See* 28 U.S.C. § 1367(a)

supervisors in their individual capacity," further dooming the claim against the Individual Defendants.[81] I agree with this reasoning.

Accordingly, the Court lacks subject-matter jurisdiction over the USERRA claim and it must be dismissed as to all Defendants.[82] Because a dismissal based on a lack of subject matter jurisdiction is not an adjudication on the merits, the dismissal must be without prejudice.[83]

### 2.    Procedural Due Process

In his procedural due process claim, Shadle contends that the individual defendants deprived him of his property right in the veterans' preference afforded by Pennsylvania state law.[84] To make out such a claim, Shadle must plausibly allege: (1) that he was deprived of "a property interest protected by procedural due process";[85] and (2) "the procedures available to him did not provide 'due process of law.'"[86]

---

(providing that supplemental jurisdiction is not permitted when "expressly provided otherwise by Federal statute").

[81] *Townsend*, 543 F.3d at 484; *Mason v. Delaware (J.P. Court)*, No. 15-CV-1191, 2018 WL 4404067, at *6 (D. Del. Sept. 17, 2018).

[82] Fed. R. Civ. P. 12(h)(3).

[83] *Aldossari ex rel. Aldossari v. Ripp*, 49 F.4th 236, 262 (3d Cir. 2022).

[84] An aggrieved plaintiff may sue for a violation of his constitutional rights pursuant to 42 U.S.C. § 1983. Other than the disputes addressed in the body of this opinion, everyone agrees that the requirements of a section 1983 claim are met.

[85] *Gikas v. Wash. Sch. Dist.*, 328 F.3d 731, 737 (3d Cir. 2003) (citing *Robb v. City of Phila.*, 733 F.2d 286, 292 (3d Cir. 1984)); *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

[86] *Hill*, 455 F.3d at 234.

"Those property rights which enjoy procedural due process protection are determined by state law."[87] Binding precedent establishes that the VPA "creates a legitimate entitlement to the preference [in hiring]," therefore "§ 7104(a) creates a property interest for the purposes of procedural due process."[88] To be clear, however, Shadle "does not have a property interest in the . . . position itself, but in the veterans' preference, which comes into play only if he has the 'requisite qualifications' for the job."[89] If and when Shadle became entitled to the preference—i.e., whether he had the "requisite qualifications"—is similarly a question of state law.

In *Brickhouse v. Spring-Ford Area School District*, the Pennsylvania Supreme Court considered what it means to be "qualified" under the VPA.[90] Drawing on prior precedent, the court reasoned that "a veteran seeking to take advantage of the preference mandated by the act must be able to demonstrate his ability to perform the job at the level of skill and with the expertise demanded by the employer."[91] The requirement that a veteran be able to perform at the employer's desired level of skill

---

[87]  *Puchalski v. Sch. Dist. of Springfield*, 161 F. Supp. 2d 395, 405 (E.D. Pa. 2001) (citing *Bishop v. Wood*, 426 U.S. 341, 344 (1976)); *see Hill*, 455 F.3d at 234 ("Whether a person has a legitimate entitlement to—and hence a property interest in—his government job is a question answered by state law.").

[88]  *Gikas*, 328 F.3d at 738.

[89]  *Id.* at 738-39 (citing *Carter v. City of Phila.*, 989 F.2d 117, 122 (3d Cir. 1993)); *id.* at 738 ("Although it is more difficult to determine whether an applicant veteran qualifies for the preference under § 7104(a), that veteran, *if qualified*, is no less entitled to the preference in § 7104(a) than he would be to the preference in § 7104(b)."); *see Merrell v. Chartiers Valley Sch. Dist.*, 855 A.2d 713, 718 (Pa. 2004) ("The property interest at issue here is not in the teaching position itself, but in the preference.").

[90]  656 A.2d 483 (Pa. 1995).

[91]  *Id.* at 486-87 (citing *Commonwealth ex rel. Graham v. Schmid*, 3 A.2d 701, 704 (1938)).

and expertise means that "merely having the appropriate certification or licensure, without more, would not serve to qualify an applicant for the job."[92] In *Merrell v. Chartiers Valley School District*, the court elaborated on its holding in *Brickhouse*, explaining that "considerable deference must be afforded the hiring authority in its determination of whether and to what extent an applicant possesses the meritorious qualities required for a position . . . . [P]ublic employers must be free to set hiring requirements to ensure competency."[93] Applying this standard, the statutory preference does not require public employers "to hire preference eligible veterans if they do not believe the candidate is qualified or possesses the requisite experience."[94] Furthermore, the Third Circuit has clearly held that "the property interest in the preference does not require that an applicant veteran be informed of the meaning of 'requisite qualifications.'"[95] Once a veteran *has* met the qualifications by "reaching the final level of consideration," the preference attaches and he must be selected.[96]

Shadle did not make it to the final stage of consideration in either of his applications. Under the preceding statement of law, that fact would be sufficient to

---

[92]  *Id.* at 487.

[93]  855 A.2d 713, 720 (Pa. 2004) (discussing *Brickhouse*, 656 A.2d 483).

[94]  *Id.* at 720.

[95]  *Gikas*, 328 F.3d at 739.

[96]  *Merrell*, 855 A.2d at 721-22; *see Merrell v. Chartiers Valley Sch. Dist.*, 51 A.3d 286, 295 (Pa. Commw. Ct. 2012) ("*Merrell II*") ("The School Board would have been required to hire Merrell, the only veteran among the final three applicants, had he reached the final step in the hiring process.").

end Shadle's case, as Defendants argue.[97] But the Pennsylvania courts have carved out an additional path for an applicant to establish entitlement to the preference.

Despite the strong deference that must be given to the employer, the Pennsylvania Supreme Court has repeatedly warned of the risk that "a public employer might be able to formulate qualifications for a job in such a way as to defeat the veterans' preference required by the act."[98] If the employer has "established qualifications meant to circumvent that Act" "in bad faith without regard to legitimate need, they must fail."[99] That determination must be made "on a case by case basis."[100] This second route is far broader than the first, and does not lend itself to resolution on a motion to dismiss.[101] From the limited precedent available, it appears that a Court should only foreclose this route if it is exceedingly clear that the applicant did not meet the position's legitimate qualifications.[102]

Accordingly, although the Court finds Shadle's position tenuous at best, the allegations are sufficient to survive a motion to dismiss. Shadle contends that he met

---

[97]    *See* Doc. 15 (Mot. to Dismiss Brief) at 14 (arguing that "Plaintiff did not reach the final selection process").

[98]    *Brickhouse*, 656 A.2d at 487.

[99]    First *Merrell*, 855 A.2d at 721, then *Brickhouse*, 656 A.2d at 487.

[100]   *Brickhouse*, 855 A.2d at 487.

[101]   *See Merrell*, 855 A.2d at 721-22 (criticizing the "scant record" and remanding to permit the veteran to "show that there was a flaw in the process that precluded the ripening of his interest").

[102]   *See Brickhouse*, 656 A.2d at 487-88 ("In this case, there is no doubt that the school district's criteria for employment were rationally related to the job and that Brickhouse's credentials did not qualify him for the job. Were these considerations less apparent than they are, we would remand for an evidentiary hearing to determine whether the employer's requirements for the job were reasonable and the whether the applicant was 'qualified' with respect to those requirements.").

the publicly available minimum qualifications and was repeatedly informed that he was qualified for the role during his first application. He also made it through several stages of the first hiring process. Although he did not progress to the final round of consideration for either posting, it is not outlandish to infer bad faith in the formulation of qualifications from Shadle's allegations that the Individual Defendants: (1) refused to hire any applicants at the end of the first posting; (2) provided conflicting explanations regarding whether Shadle met the minimum requirements for the position; (3) at times expressed unfamiliarity or noncompliance with the VPA; (4) changed the public qualifications for the second posting; and (5) hired an individual for the second posting whom Shadle had outperformed on the first posting.

Moreover, these considerations also go to the issue of whether Shadle was deprived of his entitlement through a valid procedure. Essentially, Shadle contends that the hiring processes were rigged to prevent him from making it to the final round of consideration such that the veterans' preference would be avoided. It is well established that "where a particular process is inadequate, effectively blocked, or a sham, that process . . . would not provide the due process required by law."[103]

---

[103] *Saucon Valley Manor, Inc. v. Miller*, 392 F. Supp. 3d 554, 581 (E.D. Pa. 2019) (quoting *Yelland v. Abington Heights Sch. Dist.*, No. 16-CV-2080, 2017 WL 6206289, at *4 (M.D. Pa. Dec. 8, 2017)); *see Bakalis v. Golembesky*, 35 F.3d 318, 326 (7th Cir. 1994) ("[A] body that has prejudged the outcome cannot render a decision that comports with due process.").

Accordingly, Shadle has adequately pled both elements of a procedural due process claim, and the motion to dismiss is therefore denied as to this issue.

### 3.    Equal Protection

In his equal protection claim, Shadle contends that he was discriminated against because he is a man. "[T]o establish a gender discrimination claim under the Equal Protection Clause, a plaintiff must allege: (1) disparate treatment in relation to other similarly situated individuals, and (2) that the discriminatory treatment was based on sex."[104]

As to the first prong, although Defendants argue that Shadle "fails to make any allegations that Holly Evans, as a female, was treated differently than he was,"[105] Shadle has clearly alleged that Ms. Evans was hired and he was not. That is disparate treatment. Whether he has sufficiently alleged that Ms. Evans was similarly situated is a closer question, but he has met the bar here. "'Persons are similarly situated under the Equal Protection Clause when they are *alike* in all relevant respects,'" "'but the law in the third circuit does not require [the plaintiff] to show that the [comparators] are *identical* in all relevant respects.'"[106] Shadle explains that he and

---

[104] *Johnston v. Univ. of Pittsburgh of the Commw. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 667 (W.D. Pa. 2015) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990)); *Kahan v. Slippery Rock Univ. of Pa.*, 50 F. Supp. 3d 667, 705 (W.D. Pa. 2014); *Gilson v. Pa. State Police*, 175 F. Supp. 3d 528, 557 (W.D. Pa. 2016).

[105] Doc. 15 at 16.

[106] *Brooks v. State Coll. Area Sch. Dist.*, 707 F. Supp. 3d 448, 468 (M.D. Pa. 2023) (quoting *Stradford v. Sec'y of Pa. Dep't of Corr.*, 53 F.4th 67, 74 (3d Cir. 2022) and *Southersby Dev. Corp. v. Borough of Jefferson Hills*, 852 F. Supp. 2d 616, 628 (W.D. Pa. 2012)).

Ms. Evans both had similar qualifications for the position, and that the distinctions in their "Preferred Qualifications" were not pertinent to the job duties.[107] He also alleges that, in the first hiring round, Ms. Evans scored lower than he did in pre-interview reviews, further supporting an inference that they were similarly qualified, or even that Shadle was more qualified.[108]

On the second prong, Shadle "must show an intentional or purposeful discrimination."[109] "[W]ithout more, the mere existence of disparate impact does not prove purposeful discrimination."[110] "Evidence of procedural irregularities . . . may raise an inference of discriminatory intent. However, there must be some evidence that the irregularities were related to the plaintiff[']s protected class."[111] Here, the totality of Shadle's allegations of sex discrimination, as set forth in his brief in opposition, consist of the fact that Evans was a female combined with the procedural irregularities of the second posting including "'Preferred Qualifications' and the ability to provide 'Optional Documents' tailored specifically to benefit and enable the hiring of Evans" and "not affording Shadle an interview following the June 2023

---

[107] Doc. 12 ¶¶ 100-07.

[108] *Id.* ¶ 67.

[109] *Williams v. Macut*, No. 15-CV-1645, 2016 WL 4988401, at *5 (M.D. Pa. Sept. 19, 2016) (citing *Snowden v. Hughes*, 321 U.S. 1, 8 (1944)).

[110] *Doe v. Williamsport Area Sch. Dist.*, 699 F. Supp. 3d 306, 323-24 (M.D. Pa. 2023) (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977)).

[111] *King v. Mansfield Univ. of Pa.*, No. 15-CV-0159, 2019 WL 1003612, at *6 (M.D. Pa. Feb. 28, 2019) (quoting *Blunt v. Lower Merion Sch. Dist.*, 826 F. Supp. 749, 760 (E.D. Pa. 2011)); *see Raven v. City of Phila.*, No. 15-CV-4146, 2017 WL 930316, at *3 (E.D. Pa. Mar. 8, 2017) (quoting *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014)); *see also Arlington Heights*, 429 U.S. at 261-62.

job posting while giving Evans an interview."[112] There is nothing in the complaint to directly or obliquely suggest that the Individual Defendants harbored any animus against men as a class. These allegations are simply too thin to create a reasonable expectation that discovery will provide evidence that the irregularities were an intentional effort to discriminate against Shadle because he is a man.

Shadle could, of course, allege some additional information which would increase the likelihood that Defendants acted with sex-based discriminatory intent. Or, if discovery *does* produce evidence of sex-based animus, he could seek to reassert this claim.[113] But, as it stands, his allegations fall short of stating a sex-based equal protection claim, and that count is dismissed without prejudice.

### 4.    Civil Rights Conspiracy

Title 42 U.S.C. § 1985 prohibits conspiracies to interfere with civil rights. To state a claim under that statute, the plaintiff must allege four elements: "(1) a conspiracy motivated by invidious discriminatory animus; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an

---

[112]  Doc. 17 (Opp'n to Mot. to Dismiss) at 20. Shadle lists a few other bits of evidence, but they just restate the disparate treatment and so add nothing. *See id.* (listing "hiring Evans over Shadle despite the fact that both did not meet the 'Preferred Qualification' of 'Completed training relevant to the position,'" and "awarding Evans the position").

[113]  Given that Shadle will have the opportunity to conduct discovery regarding the irregularities in the hiring process, it should very quickly become apparent whether he might be able to reassert his equal protection claim.

act in furtherance of the conspiracy; and (4) as a result, a person either is injured in his person or deprived of any right or privilege of a citizen of the United States."[114]

Shadle's claim fails both aspects of the first element. Start with conspiracy. A defendant must allege an agreement or a "meeting of the minds"[115] between the supposed conspirators through "facts from which a conspiratorial agreement can be inferred."[116] Such circumstantial allegations can include: "that the alleged conspirators did or said something to create an understanding, the approximate time when the agreement was made, the specific parties to the agreement, the period of the conspiracy, or the object of the conspiracy."[117] Other than general allegations that Maurer and Sauers worked together, there is no suggestion that they communicated about Shadle's application, much less that they reached an agreement about how to handle it. Indeed, the only allegations about communications between the two show that they *disagreed* about the second posting.[118] The bare fact that Maurer and Sauers both worked on the postings does not establish any agreement between them on the relevant issues.

---

[114] *Silvestre v. Bell Atl. Corp.*, 973 F. Supp. 475, 484 (D.N.J. 1997) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993)).

[115] *Startzell v. City of Phila.*, 533 F.3d 183, 205 (3d Cir. 2008) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

[116] *Frempong v. Sheriff of Phila.*, No. 24-CV-1064, 2024 WL 3625174, at *6 (E.D. Pa. Aug. 1, 2024) (quoting *Great W. Mining & Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010)).

[117] *Id.* (quoting *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018)).

[118] *See* Doc. 12 ¶¶ 95-97 (describing an email chain in which Sauers and Maurer took inconsistent positions about the second posting).

Turn next to "motivated by invidious discriminatory animus." This requires a non-conclusory allegation that "some . . . class-based, invidiously discriminatory animus [lay] behind the conspirators' action."[119] As noted in the prior section, Shadle's allegations do not clear the bar to create a reasonable expectation that he will discover evidence that Defendants discriminated against him because he is a man.[120]

Accordingly, Shadle has not stated a claim of conspiracy, and this count is dismissed without prejudice.

### 5.    Veterans' Preference Act

Based on my earlier discussion, it would appear that Shadle's allegations state a claim for a violation of the VPA under Pennsylvania law.[121] But the VPA claim is brought solely against the University Defendants, who argue that they are entitled to statutory and constitutional sovereign immunity.[122]

The briefing from each party on the sovereign immunity issue is quite thin.[123] Moreover, the Court is also concerned that the VPA does not provide for a private cause of action.[124] On the Court's review, VPA cases in Pennsylvania state court

---

[119] *Henry v. Essex Cnty.*, 113 F.4th 355, 363 (3d Cir. 2024) (quoting *Bray*, 506 U.S. at 268-69).

[120] *See* Section II.C.3, *supra*.

[121] *See* Section II.C.2, *supra*; *Basile v. Elizabethtown Area Sch. Dist.*, 61 F. Supp. 2d 392, 403 (E.D. Pa. 1999) (finding that analysis of VPA claim was duplicative of due process claim based on deprivation of entitlement to veterans' preference under VPA).

[122] Doc. 12 at 34-37; Doc. 15 at 9-10.

[123] Doc. 15 at 9-11; Doc. 17 at 11-12.

[124] 51 Pa. Cons. Stat. §§ 7101-11 (making no provision for a private cause of action).

almost invariably arise from administrative appeals of the decision of the relevant state authority,[125] and the few federal cases do not analyze the cause of action issue.[126] The Court is reluctant to wade into this confused area of law without significantly greater development by the parties.[127] Given that the due process claim, which is duplicative of the VPA claim, will continue, the Court sees little reason to unwind this tangled knot now.[128] Moreover, Shadle seeks declaratory judgment on

---

[125] *See, e.g.*, *Donahue v. Pa. Dep't of Hum. Servs.*, 343 A.3d 767 (Pa. Commw. Ct. 2025) (Table) (appeal from Civil Service Commission Order); *Dep't of Corr. v. Lynn*, 306 A.3d 338 (Pa. 2023) (appeal from Civil Service Commission Order); *Blake v. State Civ. Serv. Comm'n*, 166 A.3d 292 (Pa. 2017) (appeal from Civil Service Commission Order); *Soberick v. Salisbury Twp. Civ. Serv. Comm'n*, 874 A.2d 155 (Pa. Commw. Ct. 2005) (appeal from Civil Service Commission Order); *Pa. Game Comm'n v. State Civ. Serv. Comm'n*, 789 A.2d 839 (Pa. Commw. Ct. 2002) (appeal from Civil Service Commission Order); *Housing Auth. of Cnty. of Chester v. Pa. State Civ. Serv. Comm'n*, 730 A.2d 935 (Pa. 1999) (appeal from Civil Service Commission Order); *Brickhouse*, 656 A.2d 483 (appeal *nunc pro tunc* of school board's decision); *Herskovitz v. State Civ. Serv. Comm'n*, 534 A.2d 160 (Pa. Commw. Ct. 1987) (appeal from Civil Service Commission Order); *Rasmussen v. Borough of Aspinwall*, 519 A.2d 1074 (Pa. Commw. Ct. 1987) (appeal from decision of borough council); *Ne. Educ. Intermediate Unit. No. 19 v. Stephens*, 510 A.2d 1267 (Pa. Commw. Ct. 1986) (appeal from decision of Board of Directors). *But see Zablow v. Bd. of Educ. Of Sch. Dist. of Pittsburgh*, 729 A.2d 124 (Pa. Commw. Ct. 1999) (remanding case apparently brought directly pursuant to section 7104(a)).

[126] *Basile*, 61 F. Supp. 2d at 406; *Lucas v. Cnty. of Allegheny*, No. 05-CV-0760, 2007 WL 2752143 (W.D. Pa. Sept. 19, 2007); *Tranter v. Crescent Twp.*, No. 06-CV-0355, 2006 WL 1851299 (W.D. Pa. July 3, 2006); *O'Conner v. Kelly*, 2004 WL 1012853 (E.D. Pa. May 5, 2004); *Drelick v. City of Phila.*, No. 94-CV-1460, 1995 WL 447645 (E.D. Pa. July 28, 1995); *cf. Oberle v. City of Duquesne*, No. 07-CV-1729, 2008 WL 1774119 (W.D. Pa. Apr. 17, 2008) (plaintiff raised section 1983 claim for violation of VPA but did not assert claim directly under VPA).

[127] *See Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 141-42 (3d Cir. 2017) (declining to decide implied cause of action and exhaustion of administrative remedies questions without briefing from the parties).

[128] The Court is cognizant of the fact that the due process and VPA claims are brought against different defendants, but all are represented by the same counsel and the scope of discovery will not vary between the claims.

this count,[129] and "sovereign immunity does not bar either mandamus or declaratory judgment actions."[130]

Accordingly, the motion to dismiss this count is denied.

## III. CONCLUSION

Defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted in part and denied in part. Plaintiff is granted leave to amend. "The Federal Rules of Civil Procedure do not address the situation in which a deficiency in a complaint could be cured by amendment but leave to amend is not sought."[131] But the law in the Third Circuit is clear that leave to amend should be "freely given" regardless of whether leave is specifically requested.[132]

As such, Plaintiff will be given fourteen days from today's date to file a second amended complaint. If no second amended complaint is filed, Defendants shall answer the remaining counts of the first amended complaint within twenty-eight days from today's date.

---

[129]  Doc. 12 at 37.
[130]  *Log Cabin Property, LP v. Pa. Liquor Control Bd.*, 276 A.3d 862, 871 (Pa. Commw. Ct. 2022); *Pa. Fed'n of Dog Clubs v. Commonwealth*, 105 A.3d 51, 59 (Pa. Commw. Ct. 2014) (reasoning that a complaint asserting claims for declaratory relief, in addition to injunctive relief and damages, cannot be dismissed based on sovereign immunity).
[131]  *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000).
[132]  *Id.* (quoting Fed. R. Civ. P. 15(a)).

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge